## FIRST PRESBYTERIAN CHURCH OF PERRY, OKLAHOMA TERRITORY v. S. P. MYERS.

1. RELIGIOUS SOCIETIES—*Rules Governing*. Voluntary religious associations and churches organized to assist in the expression and dissemination of religious doctrine may, by their governing bodies, prescribe rules and regulations for their church government and discipline, and such rules and regulations will be obligatory upon the members, congregations and officers of such general associations and will be given effect to by the civil courts.

2. ECCLESIASTIC TRIBUNALS—*Powers of*. It is the right of such religiou. unions or associations thus to establish tribunals for the decision of questions arising among themselves, and such decisions will be binding in all cases of ecclesiastical cognizance in matters of doctrine and discipline and to the extent of controlling the terms upon which the pastoral relation shall be formed and the salary accompanying it shall be demanded, and the church judicatory, having the jurisdiction on this matter, under the rules and regulations prescribed by the chief governing body of the church, shall be the exclusive judge within the jurisdiction prescribed by such rules and regulations, as to whether the pastoral relation shall be formed between a minister of the denomination and one of the churches of such voluntary association.

3. PRESBYTERIAN CHURCH—*Minister—Civil Contract*. According to the usage and form of government of the Presbyterian church a "call" made out by the congregation duly convened in which the amount of salary is fixed and inserted in the "call" does not become effective under the rules and regulations of that church until such call is placed in the hands of the minister to whom it is addressed and is deemed equivalent to a request of the congregation and of the pastor-elect for installation as pastor, but the pastoral relation can only be formally consummated with the formal sanction of the Presbytery, and the refusal of the Presbytery to place the call in the hands of the minister or to install him puts an end to the civil contract.

*Error from the Probate Court of Noble County.*

### STATEMENT OF THE CASE.

This was an action prosecuted in the probate court of Noble county by the defendant in error, who was plaintiff in the action, to recover an amount of money claimed to be due to him for services as minister of the defendant church. Judgment was rendered below in favor of

the plaintiff, Myers, for a portion of the amount claimed. The defendant, the church, brings the case here.

The petition averred the incorporation of the church, and the employment of the plaintiff by it from the 16th day of September, 1893, to the 15th day of March, 1894, upon an oral contract, upon which he claims a balance for services in the sum of $50, all of which has been paid since the incorporation of the church, except the sum of $12, which includes interest, and charged to be due. The plaintiff further averred that from the last named date, March 16, 1894, to the 15th day of March, 1895, he was employed by the defendant under an agreement, partly oral and partly in writing, the terms of which were that he was to receive the sum of $200 for his services as minister; that the services were rendered and were worth that sum, and that the defendant promised to pay the amount claimed. A small amount had been credited on this sum, received from various members of the church, and there remained due upon this item, as he claimed, $192. The plaintiff averred for a third cause of action that upon a certain oral contract and agreement make with the defendant by which he agreed to serve them as minister from the 16th day of March, 1895, to the 15th day of September, 1895, which services were to be rendered for the sum of $100, upon which the sum of $72 had been paid to him by the treasurer of the church and by the president of the board of trustees, leaving a balance due thereon, of $28.

A copy of the written part of the contract referred to was filed with the petition marked exhibit "A," and is as follows:

"PERRY, Okla., April 9, 1894.

"To the Rev. S. P. Myers: The congregation of the First Presbyterian church, of Perry, Oklahoma, at a

regularly called congregational meeting, February the 25, 1894, being well satisfied with the ministerial qualification of you, S. P. Myers, and having good hopes from their past experience of your labors among them, that your ministrations in the gospel will be profitable, to their spiritual interests, did elect and earnestly call you, and desire you to undertake the pastoral office in said congregation, furnishing you in the discharge of your duty all proper support, encouragement and obedience in the Lord.

"And that you may be free from worldly cares and avocations, according to their instructions, promise and oblige said congregation to pay you, in quarterly installments, annually, during the time of your continuing to be the regular pastor of said congregation, the sum of two hundred dollars, in addition to what the board of home missions will appropriate to your support. After the first year of your services as our pastor the salary will be arranged in accordance with the appropriation of the board of home missions for the support of the preaching of the word in the congregation.

"The time for the beginning of your remuneration shall be the 16th of March, 1894. In testimony of the foregoing, according to the instructions given us by said congregation, at the aforesaid congregational meeting, we, the elders and trustees of the aforesaid congregation, do hereunto subscribe our names this the 9th day of April, 1894. Elders, J. O. Young, M. S. Stahl; Trustees, M. C. Latta, Chas. Wenner, George Todd. The foregoing is correct. Attest: J. O. Young, Moderator."

The defendant church answered and filed its cross-bill for an accounting, in which it was declared that the defendant expressly denied the employment and agreement alleged; that it had ever obligated itself to pay the sum of $50 for the first six months referred to, but averred that the plaintiff was employed to come to Perry to serve as a minister for the Presbyterian church at a time when there was no such church in existence, and

without the knowledge of the defendant as a church, or any of the members afterward constituting the defendant corporation, and was so employed by the board of home missions of the national organization of the Presbyterian church in New York city, and at the sum of $400 for the said period of six months: that said amount was paid by said New York board and received by the plaintiff, and that he had collected a complete compensation for the services rendered, and that the employment had been accepted by the plaintiff at that salary, and that the people comprising the congregation of the church afterward made a voluntary and free will offering of $50 to the plaintiff in addition to the amount for which he was so employed, and which was paid to him and that he therefore received an excess of the amount for which he was employed, to-wit, the sum of $450, for the six months of service referred to in the first cause of action. The defendant further denied that from the sixteenth day of March, 1894, to the fifteenth day of March, 1895, the plaintiff was in the employment of the defendant, and denied that there was any contract and agreement entered into between the plaintiff and defendant whereby the plaintiff was to serve as a minister for the defendant during the said period of time, and that it was ever agreed to pay him $200 or any sum for his services during that time or that any money was ever paid to the plaintiff by the defendant or any of its members upon the pretended contract for $200, and it averred that the plaintiff was again employed as a home missionary, or "stated supply," for this field by the board of home missions referred to, at the sum of $600 for the said year from March 16, 1894, to March 15, 1895, and that said amount was paid by the New York board of missions and received by the plaintiff, and that he had full and

complete compensation for his services, and there was nothing due the plaintiff. In answer to the third cause of action, the defendant admitted that it had employed the plaintiff from March 16, 1895, to September 15, 1895, and agreed to pay him the sum of $100 therefor, but averred that different sums had been paid to plaintiff at different times amounting to almost the entire sum and more than the amount of $72.50, which plaintiff admits he had received on that account; but that the plaintiff had volunteered and agreed to collect the amount of $100 for the members of the defendant. corporation, and did make collections but refused to account for them, and had made collections from the citizens of Perry for the purpose of erecting a church edifice for the defendant congregation, and that he had refused to account for such sums, and that upon the accounting of the moneys thus collected and appropriated the defendant believed that such amount would show that the plaintiff was fully paid.

The plaintiff replied under oath, to answer and cross-petition of the defendant, denying all its allegations except the service of the notice therein mentioned. The plaintiff introduced evidence in support of his petition, and the defendant introduced evidence consisting to a "large extent of documentary evidence, introduced and marked as exhibits for identification and brought here with the case-made, consisting of 'The Rules and Form of Government of the Presbyterian church, and the different bodies thereof, to-wit, the general assembly, the synod, the Presbytery and the local churches.' "

The plaintiff introduced evidence of an original "call" marked exhibit "A" filed with his petition, to the introduction of which the defendant objected. Evidence was

introduced showing that the services declared upon in the petition were well and faithfully performed, and worth the sum stated in the plaintiff's petition, and in support of the other allegations of his petition.    It was admitted in the plaintiff's testimony that he had served the defendant corporation as minister, only, and never served as pastor, and it was further admitted by the plaintiff that the "call" introduced by him in evidence had never been presented to him or confirmed by the Presbytery in whose jurisdiction the local church, the defendant, was situated.    The defendant introduced the following documentary evidence, being extracts from the Rules and Form of Government of the Presbyterian church, and extracts from the records of minutes and transactions of the Presbytery in whose jurisdiction the defendant church is situated.

Chapter X of the Presbytery:

"A Presbytery consists of all the ministers, in number not less than five, and one ruling elder of each congregation, within a certain district."

"XIII. The Presbytery has power to receive and issue appeals from the church sessions, and references brought before them in an orderly manner; to examine and license candidates for the holy ministry; to ordain, install, remove and judge ministers."

"XV. Of the election and ordination of bishops or pastors."

"I. When any probationer shall have preached so much to the satisfaction of any congregation, as that the people appear to desire to elect a pastor, the session shall take measures to convene them for this purpose; and it shall always be a duty of the session to convene them, when a majority of the persons entitled to vote in the case shall, by a petition, request that a meeting be held."

"II.   When such meeting is intended, the session shall solicit the presence and counsel of some neighboring minister to assist them in conducting the election contemplated, unless highly inconvenient on account of distance; in which case they may proceed without such assistance."

"IV. On the day appointed the minister invited to preside, if he be present, shall   *   *   announce to the people that he will immediately proceed to take the votes of the electors of that congregation for a pastor, if such be their desire, and when this desire be expressed by a majority of voices, he shall then proceed to take votes accordingly."

"V. When the votes are taken, if it appear that a large minority of the people are averse from the candidate who had a majority of the votes and cannot be induced to concur in the call, the presiding minister shall endeavor to dissuade the congregation from prosecuting it further.   But if the people be nearly or entirely unanimous or the majority shall insist upon their right to call a pastor, the presiding minister in that case, after using his utmost endeavors to pursuade the congregation to unanimity, shall proceed to draw a call, in due form, and to have it subscribed by the electors; certifying at the same time, in writing, the number and circumstances of those who do not concur in the call; all proceedings shall be laid before the Presbytery, together with the call."

"VI. The call shall be in the following or like form, viz:

"The congregation of——being, on sufficient grounds, well satisfied of the ministerial qualifications of you, ———, and having good hopes, from our past experience of your labors, that your ministrations in the gospel will be profitable to our spiritual interests, do earnestly call and desire you to undertake the pastoral office in said congregation; promising you, in the discharge of your duty, all proper support, encouragement and obedience in the Lord.   And that you may be free from worldly

cares and avocations, we hereby promise and oblige our-selves to pay to you the sum of——in regular quarterly (or half-year or yearly) payments, during the time of your being and continuing the regular pastor of this church. In testimony whereof we have respectively sub-scribed our names this—— day of·——A. D.——. At-tested by A. B., moderator of the meeting."

"IX. The call thus prepared shall be presented to Presbytery under whose care the person shall be; that if the Presbytery think it expedient to present the call to him, it may accordingly be presented; and no minister or candidate shall receive a call but through the hands of the Presbytery."

The defendant then offered the following extracts from journal of minutes of meetings of Oklahoma Presbytery:

"Meeting of April 11, 1894, Home Missions. The report of the committee on home missions was received and its recommendations adopted, and is as follows: (3) We recommend the church at Perry to the board of home missions for the sum of one thousand dollars, less the amount of money which the field shall be able to raise. We recommend as supply of the church the Rev. James Farr, a senior in Princeton seminary. Submitted by the committee, W. F. Hawley, chairman.

"A call was presented from the First Presbyterian church of Perry for the Rev. S. P. Myers, as pastor. The Presbytery declined to place the call in Mr. Myers' hands.

"Called meeting, June 19, 1894. A paper was received from the Perry church setting forth the grounds of its grievance at the action of the Presbytery in relation to that church. And asking that the action of Presbytery taken April 11, 1894, regarding the work at Perry be rescinded. On motion the paper was laid on the table. A call from the Perry church for the installation of Rev. S. P. Myers was received and laid on the table. Rev. S. P. Myers was appointed stated supply of the Perry church for one year beginning March 16, 1894, and the

field was recommended to the board of home missions for aid to the amount of $800."

The defendant offered among others the following instructions:

"3. The jury are instructed that the written instrument relied upon by plaintiff in support of his second cause of action, and denominated a 'call' is not, under the government and rules of the Presbyterian church, by which both parties hereto are bound, a contract or obligation binding upon the church. And it being admitted that such 'call' was not presented to plaintiff by the Presbytery controlling this territory, such call must not be considered as, alone, fixing any liability upon the defendant corporation.

"4. The jury are instructed that unless they find from the evidence, that subsequent to the presentation and rejection of the call, the defendant corporation, by its proper officers or agents and in the manner and form prescribed by the government and rules of such church, (by which both parties hereto are bound), entered into a contract with the plaintiff whereby the defendant promised to pay plaintiff for the services set up in his second cause of action, the sum of $200, in addition to the amount received by him from the board of home missions, then the plaintiff cannot recover upon his second cause of action. But if you do find that such contract was, after the refusal of the Presbytery to extend the call, so entered into, then you will find for the plaintiff upon said second sum."

The judge refused to give these instructions offered by the defendant, numbered 3 and 4, to which ruling of the court exceptions were reserved. The jury found for the plaintiff and assessed the amount of his recovery at two hundred and thirty-three dollars.

Motion for a new trial was heard and overruled.

*F. H. Kellogg,* for plaintiff in error.

52—v.

*Henry Rucker*, for defendant in error.

The opinion of the court was delivered by

McATEE, J.: It was assigned as error (1) that the paper denominated a "call" was admitted in evidence over the objection of the defendant, and (2) that the court erred in refusing instructions numbered 3 and 4 asked by the plaintiff in error.

The defendant in error argues in his brief that as the only errors assigned are those of the court in regard to the admission of documentary evidence designated as a "call" and the instructions given and refused, all such entire evidence is not before the court and the court must affirm the judgment of the trial court.

The case-made is certified to by the probate judge as "a true and correct statement of all the pleadings, motions, orders, evidence, findings, proceedings and judgment in said action." We cannot say in the presence of this certificate that the evidence is not all here. The probate judge before whom the evidence was taken and the case tried certifies that it is all here and the assignments of error will be considered upon that statement.

The proposition is, upon the merits of the case, whether the plaintiff below had a right to regard the "call" made out by the officers of the defendant corporation as a contract made with him directly or whether as the plaintiff in error contends, the "call" was a tentative proposition for a contract which could not become effective without the concurrence of the Presbytery of the church; that the defendant in error was, like the plaintiff in error, bound by the rules and regulations prescribed by the "Form of Government of the Presbyterian Church in the United States of America,"

and that these had to be complied with in order to establish the pastoral relation which is here claimed by the plaintiff, and that in as much as, under the rules and regulations, "no minister or candidate shall receive a call but through the hands of the Presbytery," and if it be true that the Presbytery never placed the "call" in the defendant in error's hands that, as a matter of law, it was non-effective for any purpose and ought not to have been admitted to show the written part of the contract alleged in the petition, and ought not to have been given to the jury to consider for any purpose in behalf of the defendant in error.

Questions of a similar character in which the legal effect of the rules and regulations adopted by the chief governing bodies of the churches in this country and the effect of the action of their various judicatories, together with the rules and regulations which they adopt, have been considered in the supreme courts of a number of the states, and to a certain extent by the supreme court of the United States, and it has been uniformly held that wherever religious associations have been organized to assist in the expression and dissemination of religious doctrine and have created for their direction in matters of doctrine, church government and discipline, tribunals within the association, and that the final and controlling effect of the ecclesiastical polity thus formed upon the individual members, congregations and officers within the general association, will not be questioned, but will be given effect to in the civil courts. And that all who unite themselves to such a body do so with the implied consent to submit to the system of ecclesiastical control and are bound by it, and that it would be vain consent and would lead to the total subversion of such religious bodies,

if any one aggrieved by one of their decisions should appeal to the secular courts and could thus have that voluntary control which they had thus agreed to, reversed and destroyed. And that it is of the essence of these religious unions and it is their right thus to establish tribunals for the decisions of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance in matters of doctrine and discipline, and that this control goes to the extent of controlling the terms upon which the pastoral relation shall be formed and the salary accompanying it shall be demanded.

It was said in the case of *Watson v. Jones*, 13 Wall. 679, in the supreme court of the United States, by Justice Miller, that:

"We do not see that justice would be likely to be promoted by submitting those decisions to review in the ordinary judicial tribunals. Each of these large and influential bodies, (to mention no others, let reference be had to the Protestant Episcopal the Methodist Episcopal and the Presbyterian churches), has a body of constitutional and ecclesiastical law of its own, to be found in their written organic laws, their books of discipline, in their collections of precedents, in their usages and customs, which, as to each, constitute a system of ecclesiastical law and religious faith that tasks the ablest minds to become familiar with. It is not to be supposed that the judges of the civil courts can be as competent in the ecclesiastical law and religious faith of all these bodies as the ablest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so."

The opinion proceeds further to say that:

"In the very important case of *Chase v. Cheney*, 58 Ill. 509, recently decided in the same court, Judge Lawrence,

who dissented, says: 'We understand the opinion as as implying that in the administration of ecclesiastical. discipline, and where no other right of property is involved than loss of the clerical office or salary incident to such discipline, a spiritual court is the exclusive judge of its own jurisdiction, and that its decision of that question is binding upon the secular courts.' And he dissents with Judge Sheldon from the opinion because it so holds."

And it further said that:

"We cannot better close this review of the authorities than in the language of the supreme court of Pennsylvania, in the case of *German Ref. Ch. v. Seibert*, 3 Pa. St. 291: 'The decisions of ecclesiastical courts, like every other judicial tribunal, are final, as they are the best judges of what constitutes an offense against the word of God and the discipline of the church. And any other than those courts must be incompetent judges of matters of faith, discipline and doctrine; and civil courts, if they should be so unwise as to attempt to supervise their judgments on matters which come within their jurisdiction, would only involve themselves in a sea of uncertainty and doubt which would do anything but improve either religion or good morals.' "

It cannot be otherwise than concluded that, in order to maintain the unity of the faith and doctrine as held in either of the voluntary religious associations of this country, the individual opinions of the pastors placed in authority and charge over the various chnrches of the denominations respectively should be the proper subject of ecclesiastical control and discipline, to be treated of and regulated by the various authoritative church bodies and jurisdictions to which each respectively belong. And that in the presence of rules and regulations, if such are found to have been made by the supreme governing body of such a voluntary association, the various members,

congregations and officers who have voluntarily asso-
ciated and have subscribed to such rules and regulations
and books of discipline shall be bound by them, and, as
in this instance, to the extent of holding that the right
to salary as an incident to such discipline and that the
spiritual court provided for in the book of discipline is
the exclusive judge of its own jurisdiction and that its
decisions upon all questions touching the establishment
of the pastoral relation, if treated of and if the terms
upon which that relation is provided for in such books of
discipline, is final and binding on the secular courts.

And this is the view which has been held and fully
announced in the case of *West v. First Presbyterian
Church of St. Paul*, 41 Minn. 94. In that case the call
was extended to the plaintiff regularly by the Presbytery
but was never formally accepted by him. It was there-
fore contended that he had never become a regular pas-
tor of the church.

The opinion holds that:

"According to the usage and form of government of
the Presbyterian church the call is made by the congre-
gation duly convened, and the amount of compensation
or salary is fixed by it, and inserted in the call. But the
pastorial relation can only be established with the con-
sent and under the authority and direction of the Pres-
bytery having jurisdiction. The call and proceedings of
the parties under it are subject to the usages and disci-
pline of the church, and the courts will not interfere any
further than is necessary to ascertain and protect the
strict legal rights of the parties. The call made by the
congregation is submitted to the Presbytery, and if ap-
proved by that body, and accepted by the candidate, the
pastorial relation is then formally constituted by instal-
lation by or under the direction of the Presbytery, and
usually as soon as conveniently may be. The call and
its acceptance are deemed equivalent to a petition and

request of the congregation and pastor-elect for such installation; but, as the pastoral relation can only be formally consummated with the formal sanction of the Presbytery, so that the judicatory may withdraw its approval and refuse to proceed with the installation, and according to its rules and established usage it will refuse to do so, if, at the time appointed therefor, the congregation then declines to receive the candidate as their minister.

"The Presbytery, it appears, has the supervision and care of the churches in a particular district in connection with it, and in general has authority to order whatever pertains to their spiritual welfare, so that it may·approve and establish a pastoral relation, or disapprove and annul it, and a dissolution of the pastoral relation, or a refusal to install puts an end to the civil contract. Citing *Robertson v. Bullions*, 9 Barb. 135; *Connitt v. Church*, 4 Lans. 339."

And it was held in *Paddock v. Brown*, 6 Hill, p. 592, that:

"The form, character and purpose of it, as well as the authority whence it issues, will be seen by referring to the fifteenth chapter of the Form of Government, etc., of the Presbyterian church, (Const. of the Presb. Church, p. 436, ed. of 1842), which may be resorted to, upon established principles of law, in order to arrive at the true meaning and legal effect of the 'call.' It will there be found to be an instrument issuing from the congregation, which may be signed either by the elders and deacons, by the trustees, or by a select committee, and attested by the moderator of the meeting. In the case before us it did so issue, was signed by three elders and one trustee, and attested by the moderator.

"The plaintiff was himself a minister of the Presbyterian denomination, and was of course familiar with the prescribed mode of proceedings preparatory to and in making out a 'call' in due form."

The question in that case was one as to the liability of the congregation itself or of the trustees. No question

arose as to the action of the Presbytery upon the call, and consequently no action of the Presbytery was requisite in order to make the "call" valid. The case was decided in 1844, and it is cited here solely for the purpose of showing that the courts will consider the call, its form, character and purpose and will charge the minister who may sue with knowledge of the prescribed mode of proceedings preparatory to and in the making out of a "call" in due form.

Other authorities are: *East Norway Lake, etc., Church v. Halvorsen,* 42 Minn. 503; *Watson v. Farris,* 45 Mo. 183; *McGinnis v. Watson,* 41 Pac. St. 21; *Mc-Roberts v. Mondy,* 19 Mo. App. 26; *Powers v. Vudey,* [Neb.], 63 N. W. Rep. 476; *Kerus v. Robertson,* [Ill.], 40 N. E. Rep. 343; *Krecker v. Shirley,* [Pa.]; 30 Atl. Rep. 440; *Pavender v. Ash,* [Neb.], 63 N. W. Rep. 476; *Juker v. Com.* 20 Pa. St. 484.

Adopting the views thus uniformly expressed, it is manifest that in as much as the rules and regulations of the Presbyterian church require that a "call" should be made out by a regularly called meeting of the congregation, and when thus made out it should be presented to the Presbytery under whose care the person called shall be, and that if the Presbytery think it expedient to present the call to him it may accordingly present it, and no minister or candidate shall receive a call but through the hands of the Presbytery, and that if the Presbytery had declined to place the call in the plaintiff's hands, then it could never have been effective, nor could ever have been so considered by the defendant in error.

The plaintiff himself admitted that the call had never been presented to him or confirmed by the Presbytery in whose jurisdiction the local church, the defendant, was

situated, and that while he was serving the defendant church during the period, that he served them as minister only, and never as "pastor." The call itself provides in express terms for a "pastorate." It is an invitation to the plaintiff to undertake the pastoral office of said congregation, and creates a compensation upon the condition of "your being and continuing to be the regular pastor of said congregation." Leaving out of view that control and effect which this court must concede to the judicatory termed Presbytery in the Presbyterian church system, it is here admitted by the plaintiff that he never undertook the work to which the call offered by him in the case and introduced in evidence, invited him, that is, that he never became the regular pastor of said congregation, and upon this contention alone it would appear that he must fail in this action unless it be held that the casual service termed "ministration" is held to be equivalent to and identical with the service, office and responsibility of the "regular pastor" filling the pastoral office. But this cannot be, since a minister is one who, having been ordained to the ministry, undertakes to perform certain services for another, while a pastor is one who has been "installed according to the usage of some Christian denomination in charge of the specific church or body of churches." (Century Dictionary, titles, Minister and Pastor; Webster's Dictionary, same titles).

And under the form of government of the Presbyterian church, it is one who has been installed by the Presbytery itself over the particular church, and that they have approved the "call" made out by the congregation and placed the same in his hands and he has accepted it. The "call" specifies that the cempensation shall be paid for "services as our pastor." We hold that the "call" should not have been admitted in evidence to prove the

contract in the absence of evidence to prove the contract here sued upon, but that the court should, as a matter of law, have instructed the jury, that the written instrument relied upon by the plaintiff in support of his second cause of action and denominated a "call" is not, under the government and rules of the Presbyterian church, by which both parties are bound, a contract or obligation binding upon the church. And that, since it was admitted that the call was not presented to the plaintiff by the Presbytery controlling this territory, the "call" should not have been considered, alone, as fixing any liability upon the defendant corporation.

The case will therefore be reversed and remanded for further proceedings in accordance with these views.

All the Justices concurring.