1997 OK 123

**Nicholas A. SOMMER, Respondent,**

v.

**Kay L. SOMMER, Petitioner.**

No. 87159.

Supreme Court of Oklahoma.

Oct. 14, 1997.

As Corrected Oct. 20, 1997.

Eric J. Groves, Groves & Tague, Oklahoma City, for Petitioner.

Gomer Smith, Jr., Oklahoma City, for Respondent.

SUMMERS, Vice Chief Justice.

¶1 Our state constitution provides that "Imprisonment for debt is prohibited, except for the non-payment of fines and penalties imposed for the violation of law." Okla. Const.Art. 2 § 13. The question before us is whether that provision is violated when past due court-ordered alimony payments are reduced to judgment, and that judgment is enforced by a contempt proceeding which could result in imprisonment. We conclude that a contempt proceeding to satisfy an award of support alimony is constitutionally permissible even though the payments have been reduced to judgment.

¶2 The 1985 divorce decree ordered Husband to pay Wife support alimony in the amount of $101,400.00 at the rate of $1,300 per month. In 1989 Ex-wife obtained a judgment in the amount of $7,068 based upon the past-due unpaid alimony. The decree was modified reducing the amount of alimony. Then in 1994 the she obtained a judgment in the amount of $29,000 based on past-due alimony payments.

¶3 She then brought a proceeding for indirect contempt, citing Ex-husband's failure to pay support alimony from 1990 through 1993. Ex-husband filed a motion in limine, seeking to exclude from evidence any non-payments of alimony that Ex-wife had reduced to judgment. The trial court sustained the motion in limine, and ruled that any alimony payment reduced to judgment could not be used to show contempt of the decree. The trial court then certified its order for our discretionary review.

¶4 This Court has jurisdiction of an appeal to review a sentence imposed for contempt of court occurring in a civil matter. Okla.Sup.Ct.R. 1.21(e)(1); *Fulreader v. State,* 408 P.2d 775 (Okla.1965). An order in contempt proceedings is not appealable by right until the judgment and sentence become final. *First Nat. Bank and Trust Co. of Ada v. Arles,* 1991 OK 78, 816 P.2d 537, 539; *Hampton v. Hampton,* 1980 OK 46, 609 P.2d 772. The order in this case is not final.

¶5 However, this Court may exercise its discretion to review certain interlocutory trial court orders when certified by the trial court. The order must affect a substantial part of the merits of controversy and be certified by the trial judge that an immediate appeal may materially advance the ultimate termination of the litigation. 12 O.S. 1991 § 952(b)(3). We have said that the term "merits" includes the real or substantial grounds of an action or defense, and excludes matters of practice, procedure, and evidence. *Ellison v. Ellison,* 1996 OK 64, ¶5, 919 P.2d 1, 2; *Pierson v. Canupp,* 1988 OK 47, 754 P.2d 548, 552 n. 8.

¶6 The trial court order does more than exclude evidence used to prove an alleged contempt. The order makes findings that (1) Ex-wife can no longer enforce unpaid support alimony payments by indirect contempt when the payments are reduced to judgment, (2) collection procedures available to a judgment creditor are not cumulative when the judgment is based upon unpaid alimony support, (3) an election by the judgment creditor to reduce the alimony arrearage to judgment is an election to forego collection by indirect contempt and, (4) a creditor loses the ability to use contempt to enforce alimony when the alimony is converted to a judgment. The trial court thus ruled that as a matter of law Ex-wife could not proceed on her contempt citation for alimony payments that had been reduced to judgment.[1] We previously granted certiorari and

---

1. The dissent would hold that all post-judgment issues are beyond this court's power to review

when they are presented to us by a certified interlocutory order. This same argument was

stayed further proceedings in contempt pending our resolution of the question. We now dissolve that stay, effective the date the mandate is filed in this Court.

¶7 In Oklahoma contempts are not governed by the common law, but by the Oklahoma Constitution and Statutes. *Watson v. State ex rel. Michael,* 1989 OK 116, 777 P.2d 945, 946.[2] Contempt has been statutorily classified as either indirect or direct. 21 O.S.1991 § 565; *Woodworth v. Woodworth,* 173 Okla. 554, 48 P.2d 1052, 1055 (1935). Direct contempt involves conduct in the presence of, or near, the court. 21 O.S. 1991 § 565; *Ex parte Plaistridge,* 68 Okla. 256, 173 P. 646, 647 (1918). Indirect contempt includes "the willful disobedience of any process or order lawfully issued or made by a court; ...." *Id.*

¶8 We have said that disobedience of an order to pay alimony in a divorce proceeding constitutes indirect contempt of court. *Ex parte Bighorse,* 178 Okla. 218, 62 P.2d 487, 489 (1936); *Wells v. Wells,* 46 Okla. 88, 148 P. 723 (1915), (Syllabus by the Court). See *Whillock v. Whillock,* 550 P.2d 558 (Okla. 1976) where we affirmed a judgment for contempt arising from the non-payment of alimony. In *Ex Parte Chase,* 141 Okla. 75, 284 P. 294 (1930) we observed that statutes expressly authorized the enforcement of an award of alimony by attachment and contempt. *Id.* 284 P. at 296, citing, C.O.S. 1921 §§ 506, 507. Our alimony statutes no longer

use the term "attachment," but they do expressly authorize contempt proceedings for violation of a temporary order[3] and an order pertaining to the division of property pursuant to a divorce decree or separate maintenance action.[4] In addition, the Legislature has defined an indirect contempt to include the willful disobedience of any process or order lawfully issued or made by a court. *Seay v. Howell,* 311 P.2d 207, 208 (Okla. 1957). The statutes thus authorize using a court's contempt powers to enforce an order directing the payment of alimony.

¶9 The people have proclaimed that debt shall not be the basis for imprisonment. Okla.Const. Art. 2 § 13. A constitutional scholar has stated that our prohibition of imprisonment for debt was derived from the Massachusetts Body of Liberties of 1641 and similar provisions in the Constitutions of Missouri, Alabama, Georgia, Maryland, Mississippi, and Texas. R.L. Williams, *The Constitution of Oklahoma and Enabling Act,* Art. 2 § 13 (2d ed.1941). See 5 *Sources and Documents of United States Constitutions,* 52 (W. Swindler ed., 1975). Although judicial process, i.e., the decree, is being enforced by contempt and imprisonment, it is the nature of the claim underlying the decree that determines if that imprisonment is lawful. Thus this Court, as well as others, has examined the alimony claim underlying the judgment or decree and determined that it is not a "debt" within the meaning of that term in Art. 2 § 13.

---

presented in dissent but rejected by a majority of the court in *Willoughby v. City of Oklahoma City,* 1985 OK 64, 706 P.2d 883, a case in which we resolved a question presented by a certified interlocutory order disposing of a post-judgment issue.

2. A court also possesses inherent power to punish for contempt. *Harber v. Shaffer,* 1988 OK 45, 755 P.2d 640, 641. However a court's inherent power to define and punish contempts does not supersede or override any conflicting provision of the Oklahoma Constitution. See *Seay v. Howell,* 311 P.2d 207, 208 (Okla.1957) where this Court explained that under our form and theory of government all governmental power is inherent in the people, the people possess the power to deprive the courts of their inherent powers to define contempts, and that power to define contempts has been specifically delegated by the people to the Legislature in accordance with

Article 2 § 25 of the Oklahoma Constitution. The Court of Criminal Appeals expressed a similar view in *Brown v. State,* 89 Okla.Crim. 443, 209 P.2d 715, 719 (App.1949) when it explained that although the power to punish for contempt is inherent in courts, such power must be exercised by mandatory constitutional and statutory provisions and not by common law rules.

3. 43 O.S.Supp.1992 § 110.

4. Former 12 O.S.Supp.1985 § 1276.2 provided for enforcement of a property award directing the payment of money via a court's contempt powers. In 1992 a similar provision was codified at 43 O.S.Supp.1992 § 111. That section states that: "Any order pertaining to the division of property pursuant to a divorce decree or separate maintenance action, if willfully disobeyed, may be enforced as an indirect contempt of court."

¶10 For example, in *Ex parte Bighorse,* 178 Okla. 218, 62 P.2d 487 (1936) we said that:

It is the general rule supported by the weight of authority that alimony is not a debt within the constitutional or statutory provisions against imprisonment for debt, and generally there is no distinction between temporary and permanent alimony.

*Id.* 62 P.2d at 489, citing, *Cain v. Miller,* 109 Neb. 441, 191 N.W. 704, 30 A.L.R. 125 (1922) and the cases annotated therein.

In *Commons v. Bragg,* 183 Okla. 122, 80 P.2d 287 (1938) we again said that alimony was not a debt within the constitutional and statutory provisions against imprisonment for debt. We said that an order for the payment of alimony possesses different characteristics from an ordinary debt, since it is designed to secure the performance of a legal duty in which the public has an interest. *Id.* 80 P.2d at 290, citing, *Cain v. Miller, supra.*

¶11 Then in *Potter v. Wilson,* 1980 OK 51, 609 P.2d 1278, we explained in the context of the constitutional prohibition of Art. 2 § 13 that "debt" is sometimes defined as limited to contractual obligations, and that it is a technical term not coextensive in meaning with "judgment debt". *Id.* 609 P.2d at 1280. In accord with this teaching our Court of Criminal Appeals has said that Art. 2 § 13 prohibits imprisonment for breach of a contractual obligation. *Ex parte Small,* 92 Okl. Cr. 101, 221 P.2d 669, 678–679 (1950). Courts in other states have likewise concluded that when the claim underlying the judgment or decree is alimony the court's order may be enforced by contempt without violating constitutional restrictions on imprisonment for debt, because the nature of alimony is not a debt.[5]

¶12 Pursuant to this type of analysis courts look not to the form the judicial process takes, but the nature of the claim underlying that process. In one case a party argued that marriage was a contract, support was a term of that contract, a breach thereof created a debt, and that debts were not subject to enforcement by contempt. *State v. English,* 101 S.C. 304, 85 S.E. 721, L.R.A. 1915F, 977 (1915). The South Carolina court disagreed, and explained that the duty of support also arose by statute, that society had a direct interest in the continued performance of the support obligation, and that husband's failure to pay was a breach of that public duty and not a mere debt owed to the wife. *Id.* 85 S.E. at 722. This language is similar to ours in *Commons v. Bragg, supra.* See also *Middleton v. Middleton,* 329 Md. 627, 620 A.2d 1363, 1366 (1993) where that court stated: "It is the substance of the obligation that the monetary claim represents, not the form that it takes, that is dispositive [of whether the claim is a debt]." In addition to defining "debt" in such a way that does not include the alimony obligation, some courts have said that the contempt arises from a willful failure to obey the order of the court and pay the alimony, as opposed to imprisonment for debt. *See e.g., Ensley v. Ensley,* 239 Ga. 860, 238 S.E.2d 920 (1977).

¶13 The argument made here is that when the alimony decree-required payment is reduced to a judgment its nature is changed to a "judgment debt" and thus a debt for the purpose of Art. 2 § 13. In *Doak v. Doak,* 187 Okla. 507, 104 P.2d 563 (1940) we explained that our District Courts possess the power to issue execution to collect money adjudged to be due regardless of whether the action is classified as equitable or legal. *Id.* 104 P.2d at 565. In other words, a judgment in a divorce directing immediate payment of money may be enforced by either contempt proceedings or execution. A similar analysis was used in *Lipton v. Lipton,* 211 Ga. 442, 86

---

**5.** *Ex parte Hall,* 854 S.W.2d 656, 658 (Tex.1993), (obligation imposed by law on spouses to support one another and their children is not a debt within the meaning of constitutional provision prohibiting imprisonment for debt, but a legal duty arising from the status of the parties); *Fishman v. Fishman,* 656 So.2d 1250, 1251 (Fla. 1995), (obligation to pay alimony is personal duty owed to spouse and society and not a debt); *State ex rel. Stanhope v. Pratt,* 533 S.W.2d 567,

575 (Mo.banc 1976), (trial courts are empowered to use contempt to enforce orders for maintenance and child support); *Dozier v. Dozier,* 252 Kan. 1035, 850 P.2d 789, 793 (1993), (alimony is not a debt); *Middleton v. Middleton,* 329 Md. 627, 620 A.2d 1363, 1364–1365 (1993); *Ex parte Thompson,* 282 Ala. 248, 210 So.2d 808, 812 (1968), (alimony is a not a debt within constitutional prohibition against imprisonment for debt).

S.E.2d 299, 302 (1955), where that court concluded that "alimony may be enforced by attachment for contempt as well as by the usual process of execution." Another example of this is found in *Swanson v. Graham,* 27 Wash.2d 590, 179 P.2d 288 (1947), where that court explained that past-due alimony is a basis for writs of garnishment, writs of attachment and general executions, and may be collected through contempt proceedings. *Id.* 179 P.2d at 292.

¶14 When a decree provides for periodic payments they are not owing and enforceable until they are due. *Record v. Record,* 1991 OK 85, 816 P.2d 1139, 1143. In *Doak* we recognized this, and explained that execution should not issue until an application is filed seeking a determination of the amount due and execution therefor, and that the defendant to such proceeding be given adequate notice to appear and an opportunity to contest the amount due. *Doak,* 104 P.2d at 565. This action may be brought in the court that directed the payment or any other court of competent jurisdiction. *Turk v. Coryell,* 419 P.2d 555, 558 (Okla.1966); *Knight v. Armstrong,* 303 P.2d 421, 424 (Okla.1956). A contempt proceeding to enforce decree-ordered support has been held limited to the court that ordered the support. *Cooper v. Cooper,* 1980 OK 128, 616 P.2d 1154, 1156.

¶15 The action seeking both a determination of the aggregate due and execution results in a judgment by the District Court. *Wade v. Wade,* 570 P.2d 337, 339 (Okla.1977); *Baker v. Bursch,* 374 P.2d 31, 34 (Okla.1962). The Legislature clearly anticipated that support payments could be reduced to a judgment since it provided that: "An arrearage in payments of support reduced to judgment may be a lien against the real property of the person ordered to make such payments." 43 O.S.Supp.1992 § 134(A). Courts have recognized that a decree may be enforced by an action upon the decree.

> Final decrees imposing a definite personal obligation for alimony or support have been held to be enforceable by action the same as any other judgment for money. This is true not only as to domestic decrees, but also as to decrees rendered in other states or countries. But in so far as the decree is subject to modification it does not possess such finality as to warrant an action upon it, particularly in the case of an allowance pendente lite. This, however, would not affect the right of action as to amounts or installments already due and therefore not subject to change. The installment feature of such a decree would not prevent an action upon it, at least as to anything then due.

II *Freeman on Judgments,* § 1067 (5th ed.1925), (notes citing authority omitted).

¶16 The typical Article 2 § 13 analysis requires examining the underlying claim and not the form of the action or process. In other words, the underlying claim of alimony is not changed into an Art. 2 § 13 "debt" merely by enforcing the alimony claim via a judgment and execution as contrasted with a decree and contempt. Generally, even when familial support obligations have been reduced to a judgment they have not been considered as debts within the meaning of constitutional prohibitions against imprisonment for debt. For example, the Indiana Supreme Court said this:

> Nor do procedural steps taken by a court to assist in the collection of child support payments affect the availability of contempt. Upon the request of the parent to whom child support is owed and the entry of the requisite findings, trial courts may, as in the instant case, compute the amount and order the payment of accrued arrearages or, as in other cases, enter a money judgment against the delinquent parent for past due amounts. We view such orders and judgments, at least as they relate to child support payments in respect of unemancipated children, as natural extensions of the court's efforts to assure that parents live up to their duties to their children. As such, the nature of a parent's underlying obligations remain unchanged and it is unduly formalistic and contrary to sound public policy to consider the entry of such an order or judgment as somehow changing the obligation in such a way as to make contempt unavailable to assist in its enforcement.

*Pettit v. Pettit,* 626 N.E.2d 444, 446 (Ind. 1993), (note omitted).

The Indiana Court then quoted from the Florida Supreme Court, and explained why child support obligations should be enforceable by contempt, even if reduced to a money judgment:

> Establishing a support decree as a money judgment does not destroy the decree as an order to pay support nor is the obligation reduced to an ordinary judgment debt enforceable only at law.... The purpose of the award remains the payment of support to the former spouse or the children regardless of its form.... *Ostrander v. Ostrander*, 190 Minn. 547, 252 N.W. 449, 450 (1934). A decree for support is different than a judgment for money or property: It is a continuing obligation based on the moral as well as legal duty of a parent to support his or her children. *Sackler [v. Sackler ]*, 47 So.2d [292,] at 294 [ (Fla.1950) ] (quoting *Rule v. Rule*, 313 Ill.App. 108, 39 N.E.2d 379 (1942)). Because of this difference, a judgment for support should be enforced by more efficient means than ordinary execution at law. To hold that such a judgment can be enforced only by execution at law would amount to depriving a support award of its inherent power of enforcement by contempt. *McDuffie [v. McDuffie*, 155 Fla. 63], 19 So.2d [511] at 513 [ (1944) ]. The courts have a duty to provide an effective, realistic means for enforcing a support order, or the parent or former spouse for all practical purposes becomes immune from an order for support. In our view, this duty includes enforcement of a judgment of support by equitable processes of the court because a remedy at law that is ineffective in practice is not an adequate remedy.

*Pettit*, 626 N.E.2d at 446, quoting, *Gibson v. Bennett*, 561 So.2d 565, 569 (Fla.1990).

¶17 In a similar opinion a Texas court explained that contempt was permissible because a support obligation was not a debt, and that the contempt arose from a willful failure to obey a court order. *Ex parte Wilbanks*, 722 S.W.2d 221, 224 (Tex.App.— Amarillo 1986, no writ). The Arkansas Supreme Court reached a like result in *Gould v. Gould*, 308 Ark. 213, 823 S.W.2d 890 (1992), where it expressly overruled its former opinion in *Nooner v. Nooner*, 278 Ark. 360, 645 S.W.2d 671 (1983) with the following observation: "We have searched the law of other jurisdictions, and we find no support for the conclusion, stated in the *Nooner* case without citation of authority, that support arrearages reduced to judgment cannot be enforced the same as delinquent payments pursuant to other court orders." *Gould*, 823 S.W.2d at 892. While it is true that these opinions from Indiana, Florida, Texas, and Arkansas speak to the child support obligation, dicta therein include spousal support obligations, and the concept that a judgment for arrearage is not a debt for the purpose of constitutional prohibitions against imprisonment for debt. These opinions thus demonstrate the general proposition that reducing a support obligation to judgment does not prohibit contempt proceedings based upon a failure to pay the obligation.

¶18 In our case Ex-husband relies upon *Lepak v. McClain*, 1992 OK 166, 844 P.2d 852; *Potter v. Wilson*, 1980 OK 51, 609 P.2d 1278; *Rucker v. Republic Supply Co.*, 415 P.2d 951 (Okla.1966); and 12 O.S.1991 §§ 732, 902 to show that contempt proceedings may not proceed upon the unpaid support alimony reduced to judgment.

¶19 In *Lepak* a breach of contract action was filed, a default judgment entered, and pursuant to an agreement of the parties the trial court entered an order requiring the judgment-debtor, Lepak, to pay the judgment in installments. When the installments were not paid as ordered an application for citation for indirect contempt was filed against Lepak. We explained that Art. 2 § 13 prohibited the Legislature from authorizing the enforcement of a money judgment by using an indirect civil contempt procedure when the debtor had been ordered to pay future installments from funds not existing at the time of the order. *Id.* 844 P.2d at 853, 857–858. Unlike the present case, the nature of the claim underlying the judgment was contractual in *Lepak*. Art. 2 § 13 forbade imprisonment.

¶20 Ex-husband's reliance upon *Potter v. Wilson* gives him no relief. In *Potter* we said that "debt" is not coextensive with

"judgment debt" for the purpose of Art. 2 § 13. *Id.* 609 P.2d at 1280. He is correct in stating that a judgment is a form of indebtedness. *Rucker v. Republic Supply Co.*, 415 P.2d 951, 953 (Okla.1966). But again, the *form* of the indebtedness is not important to an Art. 2 § 13 analysis; it is the *nature* of the indebtedness that controls the application of that constitutional provision.

¶21 He cites Section 732 for the proposition that the types of execution listed therein[6] are exclusive in enforcing a judgment. Section 902 is cited for the proposition that body attachment may not be used to recover money.[7]

¶22 It is true that § 732 contains no provision for body attachment (contempt proceedings). *Potter v. Wilson*, 609 P.2d at 1280. It is also true that in *Potter* we said that § 902 excluded judgments for real property and money from the process of body attachment (contempt), and we relied upon *Pierce v. Pierce*, 609 P.2d 732 (Okla.1979). *Id.* 609 P.2d at 1280.[8] *Pierce* said that contempt may be used to enforce alimony for support, but could not be used to enforce payments in the nature of a property settlement. Our litigation involves alimony in the nature of support, and such payments are enforceable via contempt proceedings. *Johnson v. Johnson*, 460 P.2d 954, 956 (Okla. 1969).

¶23 His reliance upon authority relating to enforcing a property division by contempt does not advance his argument. Five opinions of this Court are usually cited for the proposition that alimony in the nature of

property division cannot be enforced by contempt. *Lemons v. Lemons*, 205 Okla. 485, 238 P.2d 790 (1951); *Alexander v. Alexander*, 526 P.2d 934, 935 (Okla.1974); *Huchteman v. Huchteman*, 1976 OK 174, 557 P.2d 427, 428 (Okla.1976); *Pierce v. Pierce*, 609 P.2d 732, 733 (Okla.1979). and *Potter v. Wilson*, 1980 OK 51, 609 P.2d 1278. *Lemons* involved the issue of enforcing the provision of an agreement not within the power of the divorce court to award. *Lemons*, 238 P.2d at 793. In *Alexander* we stated that property settlements were not enforced by contempt, and we relied upon *Lemons* as well as opinions from Arizona and California stating that contempt proceedings to enforce property divisions violated state constitutional prohibitions against imprisonment for debt.[9] *Huchteman's* pronouncement of the rule for property divisions relied upon *Lemons*, *Alexander*, and one of our opinions stating that support could be enforced by contempt. *Pierce* relied upon *Huchteman*. Then in *Potter* our statement concerning property awards relied upon these Oklahoma cases as well as those from Arizona and California. *Potter*, 609 P.2d at 1281 n. 14.

¶24 Subsequent to *Potter* this Court has defined "debt" to exclude orders directing the transfer of property in existence at the time of the order. We have explained that contempt *may* be used to enforce willful disobedience to a court order dividing the marital estate. *McCrary v. McCrary*, 1986 OK 49, 723 P.2d 268. In *Potter v. Wilson*, 1980 OK 51, 609 P.2d 1278, we said that a property division could not be enforced by

6. 12 O.S.1991 § 732:
   Executions are of three kinds:
   First, against the property of the judgment debtor.
   Second, for the delivery of possession of real or personal property, with damages for withholding the same, and costs.
   Third, executions in special cases.

7. 12 O.S.1991 § 902:
   When the judgment is not for the recovery of money or real property, the same may be enforced by attachment, by the court rendering judgment, upon motion made, or by a rule of the court upon the defendant; but in either case, notice of the motion or service of the copy of the rule shall be made on the defendant, a reasonable time before the order of attachment is made.

8. *Potter* cites to the opinion of the Court of Civil Appeals in *Pierce*. 609 P.2d at 1280 n. 8. However, the language of *Potter* refers to our opinion discussing contempt, and the opinion discussing contempt in that litigation was the opinion of this Court reported at 609 P.2d 732.

9. In *Alexander* we relied upon *Stone v. Stidham*, 96 Ariz. 235, 393 P.2d 923 (1964) and *Bradley v. Superior Court*, 48 Cal.2d 509, 310 P.2d 634 (1957). *Alexander*, 526 P.2d at 935. *Stone* and *Bradley* both state that property awards in divorces cannot be enforced by contempt because of state constitutional prohibitions against imprisonment for debt. *Stone*, 393 P.2d at 925 and *Bradley*, 310 P.2d at 639, 640, 642.

contempt when the payment in lieu of property was paid from future income. We correctly stated that our holding did not apply to property in existence at the time of the decree. *Id.* 609 P.2d at 1279–1280. We have said that an order to deliver specific property in existence at the time of the order may be enforced by contempt. *Chapman v. Chapman,* 1984 OK 89, 692 P.2d 1369, 1375 n. 15. In sum, an order directing the division of property and allowing payments effecting that transfer to be made in the future from one spouse to the other does not create a debt for the purpose of Art. 2 § 13, and may be enforced via contempt proceedings to correct willful disobedience to the order. *Chapman, supra, McCrary, supra.*

¶25   In *McCrary* we expressly held that a statute authorizing contempt to enforce a property award did not violate Okla.Constr. Art. 2 § 13. *Id.* 723 P.2d at 271. *McCrary* and *Chapman* are also consistent with our opinions "in which we recognized that alimony in lieu of property division is not an ordinary money judgment." *First Community Bank of Blanchard v. Hodges,* 1995 OK 124, 907 P.2d 1047, 1053. Further, in *Robinson v. McDanel,* 1990 OK 65, 795 P.2d 513, we stated that property rights are enforceable as a judgment and "are also enforceable via a trial court's power of indirect contempt." *Id.* 795 P.2d at 515. Thus, Ex-husband's reliance upon property division opinions simply will not support the view that the judgment on the arrearages should be treated differently than the decree itself.

¶26   One published opinion of our Court of Civil Appeals does come close to supporting his argument. *League v. League,* 1983 OK CIV APP 23, 735 P.2d 583. That opinion was released for publication by that court and has no precedential effect. Okla.Sup. Ct.R. 1.200. Judgment was rendered on the amount of child support arrearage, and the trial court later determined that the father had not paid the judgment and was guilty of indirect contempt. The appellate court determined that judgments for debt may not be enforced via contempt proceedings. The court concluded that when the arrearage was reduced to judgment "the contempt finding became inoperative and the mother's enforce-

ment remedies were narrowed to those relating to enforcement of the judgment." *Id.* 735 P.2d at 585. The appellate court claimed to rely on *Wade v. Wade,* 570 P.2d 337 (Okla.1977).

¶27   In *Wade* the support arrearages were reduced to judgment. We discussed the trial court's authority to allow the judgment to be paid in installments and whether it amounted to a retroactive modification of the decree. We then said that the order providing for installments limited the right of the wife to pursue statutory provisional remedies, and that these remedies were inherent in the judgment itself. *Id.* 570 P.2d at 339. *Wade* relied upon *Starkey v. Starkey,* 40 Wash.2d 307, 242 P.2d 1048 (1952) which in turn relied upon *Swanson v. Graham,* 27 Wash.2d 590, 179 P.2d 288 (1947) where it is stated that: "Accrued judgments for unpaid alimony installments are a basis for writs of garnishment, writs of attachment and general executions, and may be collected through contempt proceedings." *Wade,* 570 P.2d at 339, n. 10; *Starkey,* 242 P.2d at 1052; *Swanson,* 179 P.2d at 292. Additionally, *Wade* relied upon *Doak v. Doak, supra,* an opinion explaining that a District Court possesses the power to enforce a decree by both execution and contempt powers. *Wade* did not limit the enforcement mechanism of a support judgment to that of executions, and *League,* to the extent that it holds otherwise, is hereby disapproved.

¶28   In sum, alimony in the nature of support may be enforced via a court's contempt powers after the alimony payments become due, even after support arrearages are reduced to judgment. For the purposes of Art. 2 § 13 we view a contempt proceeding for willful failure to pay the judgment of arrearage as one for willful disobedience of the underlying support order. The Constitution is not offended. The order of the District Court is reversed, the stay is dissolved, and the District Court shall proceed in accordance with this opinion.

¶29   SUMMERS, V.C.J., and HODGES, LAVENDER, ALMA WILSON and WATT, JJ., concur.

¶30 KAUGER, C.J., concurs in result.

¶31 SIMMS, HARGRAVE and OPALA, JJ., dissent.

OPALA, Justice, dissenting from the court's decision to grant certiorari for review of the certified interlocutory order tendered in this cause.

¶1 The question before the court—certified for our review under the provisions of 12 O.S.1991 § 952(b)(3) [1]—is whether contempt will lie for the collection of past due and unpaid support alimony that has been commuted to a judgment at law.

¶2 I recede from the court's decision to grant certiorari. The question certified presents a *purely procedural·issue*. It does not affect (however minimally, tangentially or obliquely) *any substantive rights* of either the alimony obligee or those of the alimony obligor. Because we are asked to pronounce what methods are the obligee's due for collection of delinquent support alimony that stands transformed into a judgment at law, *no* issue *on the merits* is presented. The question clearly lies *dehors* this court's § 952(b)(3) cognizance.[2] I would hence deny the petition for certiorari because it tenders for decision a question *collateral to the merits* of the obligation sought to be enforced in the proceedings below.

## I

### THE ANATOMY OF LITIGATION

¶3 The plaintiff (ex-wife) is the obligee of an order for payment of support alimony, which stands commuted to judgment for the

amount of past due and unpaid installments. She instituted contempt proceedings for non-payment of the delinquent arrearage due for a period between 1990 and 1993. The ex-husband moved *in limine* for exclusion from the evidence to be offered at trial any delinquent installments which had been reduced to judgment. He argued that a *judgment's* enforcement by contempt would offend his constitutional protection from imprisonment for debt. The trial court sustained the ex-husband's argument, declaring that alimony arrearage, once commuted to judgment, may not be enforced by contempt. It is this ruling that was certified for our review under § 952(b)(3) by the trial judge's interlocutory order now before us.

## II

### ¶4 THE STATUTORY REQUIREMENTS FOR THE SUPREME COURT'S REVIEW OF A CERTIFIED INTERLOCUTORY ORDER

¶5 A proceeding to review a certified interlocutory order must meet the strictures of 12 O.S.1991 § 952(b)(3) [3] and the standards imposed by Rules 1.50–1.56.[4] The provisions of § 952(b)(3) *plainly* require that the interlocutory order certified for our review affect a substantial part of the *merits of the controversy*.[5] First and foremost to be considered here is the question whether this case presents *an issue on the merits of the controversy*. *Unlike the court's pronouncement today, I would answer this critical question in the negative.*

---

1. The pertinent terms of 12 O.S.1991 § 952(b)(3) are:

"* * * (b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof: * * * 3. *Any other order, which affects a substantial part of the merits of the controversy* when the trial judge certifies that an immediate appeal may materially advance the ultimate termination of the litigation; provided, however, that the Supreme Court, in its discretion, may refuse to hear the appeal. * * *" (Emphasis supplied.)

2. *See* the text of 12 O.S.1991 952(b)(3), *supra* note 1.

3. For the pertinent terms of 12 O.S.1991 § 952(b)(3), see *supra* note 1.

4. Rules 1.50–1.56, Rules on Perfecting a Civil Appeal, 12 O.S.1991, Ch. 15, App. 2. After this proceeding was brought, the rules' title was changed, effective January 1, 1997, to Oklahoma Supreme Court Rules.

5. *Roark v. Shelter Mutual Ins. Co., Okl.,* 1986 OK 82, 731 P.2d 389, 390 (Opala, J., concurring); *White v. Wensauer,* 1985 OK 26, 702 P.2d 15, 16; *Young v. Oklahoma City, Okl.,* 524 P.2d 22, 23 (1974); *Community National Bank of Warr Acres v. Beasler, Okl.,* 520 P.2d 813, 814 (1974); *Flick v. Crouch, Okl.,* 434 P.2d 256, 261 (1967).

## III

### ¶6  THE HISTORICAL ANTECEDENTS OF THE LEGAL TERM "MERITS"

¶7  The term "merits" ("on the merits") arrived in the Anglo–American legal tradition before the end of the writ era.[6] When the English pleading system came to be abandoned during the mid-nineteenth century, "cause of action" replaced the "writ."[7]  In the course of this transition from the earlier procedural regime to the latter, "merits" entered legal parlance clothed in a new garb. All issues that address the *elements of a "cause of action"* and *of the available defenses* constitute the *merits of the case.  Once a* cause of action has been *determined,* there can be *no issue left* for resolution on the merits.[8]  Pure postjudgment enforcement

6. For a historical discussion of the writ system and the movement to code pleading, see Fleming James, Jr., Geoffrey C. Hazard, Jr., Civil Procedure §§ 1.3–1.6 at 8–20 (2d ed.1977). The entire procedural regime of the common law was inextricably interwoven with what is called the writ system. A pleader needed first to select a proper writ that would cover the facts upon which relief was sought. It is the selected writ that governed both substantive and procedural aspects of the claim. If the facts (alleged and proved) fell within the scope of the writ and the pleader had followed the required procedures, the relief available under the writ would be granted. Jack H. Friedenthal, Mary Kay Kane, Arthur R. Miller, CIVIL PROCEDURE 238–39 (2d ed.1993). The authors of the cited treatise note that under the late-nineteenth century procedural reform in both the United States and England, "it was hoped that cases would turn on their *substantive merits* rather than on the lawyers' technical and tactical skills, as had been the case under the common law [writ] system". *Id.* (emphasis supplied).

7. The term "cause of action" is said to refer "to a group of facts that give rise to one or more rights of relief." *Fleming & Hazard, supra* note 6, § 2.9 at 75–76 (citing Clark, Code Pleading § 19 (2d ed.1947) and *Elliott v. Mosgrove,* 162 Or. 507, 93 P.2d 1070, 1072–75 (1939)). In the *Friedenthal* treatise, *supra* note 6, § 5.4 at 245, the authors discuss *the emergence of two definitions* for "cause of action"—the so-called "primary right" and the "aggregate of operative facts" doctrines. The *primary right* theory, advanced by Professor Pomeroy, relates to the nature of the injury alleged to have been suffered. It focuses on the harm rather than the acts that caused the harm or on the specific remedy—*i.e.,* a person has a primary right to be free from damage to one's real estate, from breach of contract or from injury to one's character. The *aggregate of operative facts* theory, crafted by *Clark, supra,* defines a cause of action not by the substantive law to be applied or the nature of relief sought, or the type of harm suffered, but solely by the events that give rise to a claim or claims for relief. *Id.* at 245–46. Another author notes that the term *cause of action* " 'may mean one thing for one purpose and something different for another.' " David Mellinkoff, THE LANGUAGE OF THE LAW 17 (1963) (quoting BLACK'S LAW DICTIONARY 279 (4th ed.1951) (emphasis supplied)). The term, he adds, *has been held to mean either the facts or the rights. Id.* at 296. In *Davis v. Passman,* 442 U.S. 228, 237, 99 S.Ct. 2264, 2273, 60 L.Ed.2d 846 (1979), the Court notes that by the first third of the twentieth century the phrase "cause of action," had become so "encrusted with doctrinal complexity" that the authors of the Federal Rules of Civil Procedure saw fit to eschew it altogether, requiring only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.,* 442 U.S. at 237, 99 S.Ct. at 2273 (citing Fed.Rule Civ.Proc. 8(a); *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943)). The Court observed in *Passman* that judges and commentators nevertheless "have continued to use the phrase 'cause of action' in the traditional sense established by the Codes to refer roughly to the alleged invasion of 'recognized legal rights' upon which a litigant bases his claim for relief." *Id.,* 442 U.S. at 237–38, 99 S.Ct. at 2273 (citing *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 693, 69 S.Ct. 1457, 1463, 93 L.Ed. 1628 (1949)).

8. An issue on the merits contrasts sharply with collateral orders in the federal-law sense. The latter are appealable as final decisions without regard to the mainstream litigation's posture. To fit within this class an order must dispose of a claimed right that is not an essential ingredient of the main cause and can be considered separately from its merits. *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546–547, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949); *Abney v. U.S.,* 431 U.S. 651, 659–661, 97 S.Ct. 2034, 2040–2041, 52 L.Ed.2d 651 (1977). Federal jurisprudence teaches that the disposition of an issue falling within the collateral-order exception to the final judgment rule is not a *"step toward final disposition of the merits of the case (which would) be merged in final judgment,"* but rather it poses and decides an issue completely collateral to the cause of action that is pressed. *U.S. v. Mock,* 604 F.2d 336, 339 (5th Cir.1979) (emphasis supplied). A classic example of the collateral order is afforded by Rule 11 sanctions. *See* Fed.Rules Civ.Proc., Rule 11, 28 U.S.C.A. A Rule 11 order is like the imposition of costs, attorney's fees and contempt punishment. It lies *dehors* the merits of an action because it decides a collateral issue. The proceeding focuses on abuse of judicial process, and, if that offense be found, on an appropriate sanction to be meted out.

procedure lies *dehors* the merits.[9] This case, which is *about a long-adjudged obligation's methods of postjudgment enforcement*, is here for decision on an issue clearly *collateral to the interspousal obligation's merits*.

## IV

**¶8 THE DEFINITION TO BE GIVEN "MERITS" IN THE § 952(b)(3) SENSE MUST ACCORD WITH THAT WORD'S GENERAL MEANING AT COMMON LAW**

¶9 The word "merits" has a well-defined meaning in law. What is *on or dehors the merits* depends on whether the issue at hand affects one or more elements of the claim for relief or those of the defenses that may be interposed against it.[10] Neither the title given an instrument by which the issue is tendered nor the stage of the process at which that issue was raised below can conclusively determine whether the question is on or off the merits.[11] Issues of fact or law *on the merits* are typically raised by the pleadings.[12] Occasionally, these matters do arise inferentially on motion which, to an untrained eye and *sans* careful analysis, might eclipse the merit-laden kernel of the allegation.[13]

¶10 Matters of *practice, procedure* and *evidence* are *not embraced within the term "merits"*.[14] They simply do not affect a litigant's substantive rights in the elements of a claim or defense.[15]

## V

**¶11 THE DEFINITION TO BE GIVEN THE TERM "MERITS," WHICH IS FOUND IN 12 O.S.1991 § 952(b)(3), MUST BE EXACTLY THE SAME AS THAT ACCORDED THE IDENTICAL WORD IN OTHER STATUTORY LOCATIONS**

**9.** *Roach v. Jimmy D. Enterprises, Ltd.*, 1996 OK 26, 912 P.2d 852, 854; *Flick, supra* note 5 at 261; *see also, Young, supra* note 5 at 23–24; *Beasler, supra* note 5 at 814.

**10.** *See, e.g., Pryse Monument Company v. District Court of Kay County, Okl.*, 595 P.2d 435, 437–38 (1979) (when a case is terminated as time-barred, the disposition is "on the merits" because the statute of limitations is an affirmative defense).

**11.** *Roark, supra* note 5, at 390 (Opala, J., concurring); *see also Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.*, 1996 OK 125, 932 P.2d 1100, 1104; *Tidmore v. Fullman*, 1982 OK 73, 646 P.2d 1278, 1283 (Opala, J., dissenting); *Flick, supra* note 5 at 261. *But cf. Kimery v. Public Service Company of Oklahoma, Okl.*, 562 P.2d 858 (1977).

**12.** The terms of 12 O.S.1991 § 552 provide:

Issues arise on the pleadings, where a fact or conclusion of law is maintained by one party, and controverted by the other. There are two kinds. First, of law; Second, of fact.
Pleadings are defined in 12 O.S.1991 § 2007(A). Its terms are:
A. PLEADINGS. There shall be a petition and an answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim denominated as such; a third-party petition, if a person who was not an original party is summoned under the provisions of Section 14 of this act; and a third-party answer, if a third party petition is served. No other pleading shall be allowed, except that the court may order a reply to an answer or a third-party answer.

**13.** A merit-related issue may inferentially arise on a motion *in limine* that seeks to exclude evidence supportive of a defense pleaded in the answer. *See, e.g., Roark, supra* note 5 at 390 (Opala, J., concurring). There, the certified *in limine* ruling, which in effect struck the defendant's pleaded defense of fraud, raised an issue on the merits that substantially affected the defense. A motion to vacate can inferentially raise, at a postjudgment stage, an issue on the merits. *See, e.g., Peralta v. Heights Medical Center, Inc.*, 485 U.S. 80, 84, 108 S.Ct. 896, 899, 99 L.Ed.2d 75 (1988). There, the Court held that due process of law prohibits a state from requiring defenses to be alleged as a precondition to vacation of a noticeless judgment that had been entered in violation of due process. The *Peralta* postjudgment question, which addresses a defense to the claim, is clearly *on the merits*.

**14.** *Roach, supra* note 9 at 854; *Flick, supra* note 5 at 261; *see also, Young, supra* note 5 at 23–24; *Beasler, supra* note 5 at 814; *see also Hayes v. Ricard*, 251 N.C. 485, 112 S.E.2d 123, 127 (1960) (a judgment on the merits is "one which is based on legal rights as distinguished from mere matters of practice, procedure, jurisdiction or form, or is a judgment that determines, on an issue either of law or fact, which party is right").

**15.** *Roach, supra* note 9 at 854; *Flick, supra* note 5 at 261; *Young, supra* note 5 at 23–24; *Beasler, supra* note 5 at 814.

¶12 Words in a statute are to be understood in their ordinary legal sense.[16] Whenever a statute uses, without defining, a common-law term, it is presumed that the legislature meant that term to have its technical meaning.[17] Unless a contrary intention is plainly shown, the meaning of a word is deemed to be the same no matter where it appears in a statutory compilation.[18]

¶13 We *must* accept that the word "merits," which is found in § 952(b)(3), is used there in its technical common-law sense. The same term also is present in other parts of our law's corpus.[19] Among various provisions that bear this word is the savings statute, 12 O.S.1991 § 100,[20] which authorizes the recommencement of an action that failed "otherwise than on the merits." [21] Although the term *merits* is not defined in § 100, it is apparent from the face of the section's provisions that it is used there in the strict common-law sense.[22] We are duty-bound to confine the meaning of "merits", found in § 952(b)(3), in the very same manner as that which was developed by our § 100 jurisprudence.[23] In short, the court's construction of

16. The pertinent terms of 25 O.S.1991 § 1 are: "Words used in any statute are to be understood in their ordinary sense, except when a contrary intention plainly appears...."

17. *City of Muskogee v. Landry*, Okl., 567 P.2d 988, 990 (1977); *Barton v. Hooker*, Okl., 283 P.2d 514, 517 (1955); *see also MB Construction Co. v. O'Brien Commerce Center Associates*, 63 Wash. App. 151, 816 P.2d 1274, 1276 (1991), citing *Northern Pac. Ry. Co. v. Henneford*, 9 Wash.2d 18, 113 P.2d 545, 547 (1941); *Richardson v. Doe*, 176 Ohio St. 370, 199 N.E.2d 878, 880 (1964).

18. The terms of 25 O.S.1991 § 2 are:

Whenever the meaning of a word or phrase is defined in any statute, such definition is applicable to the same word or phrase wherever it occurs, except where a contrary intention plainly appears.

19. *See, e.g.*, 12 O.S.1991 §§ 100, 683, 952; 15 O.S.1991 § 761.1(A); 18 O.S.1991 § 1031(C), 23 O.S.1991 § 103, 36 O.S.Supp.1992 §§ 1937, 2020.

20. The terms of 12 O.S.1991 § 100 are: "If any action is commenced within due time, and a judgment thereon for the plaintiff is reversed, or if the plaintiff fail in such action otherwise than *upon the merits*, the plaintiff, or, if he should die, and the cause of action survive, his representatives may commence a new action within one (1) year after the reversal or failure although the time limit for commencing the action shall have expired before the new action is filed." (Emphasis supplied).

21. In the writ system's context the word "merits" was often used to set apart case terminations effected for want of jurisdiction (or for some other reasons unrelated to the legal sufficiency of the plaintiff's demand or the defendant's defense) from cases that failed because of some legal infirmity in the plaintiff's claim or in the defendant's attempt to defeat it. The former reasons came to be known as "otherwise than on the merits," while the latter are called "on the merits." *Pryse, supra* note 10 at 437–38. This was the law's way of separating purely *procedural failures* from those based on want of a substantive right. Purely procedural failures came to be protected from the bar of *res judicata*. For historical antecedents that led to the enactment of the original English version of our savings statute, 12 O.S.1991 § 100, see *Gaines v. City of New York*, 215 N.Y. 533, 109 N.E. 594, 595–96 (1915); *Matter of Estate of Speake*, 1987 OK 61, 743 P.2d 648, 650.

22. The savings provisions in 12 O.S.1991 § 100 are applicable to actions timely filed and later dismissed on grounds *dehors the merits of the controversy*. *Ross v. Kelsey Hayes, Inc.*, 1991 OK 83, 825 P.2d 1273, 1277. Section 100 is identical in purpose and in form to its English prototype, the English Limitations Act of 1623 (21 Jac. I, c. 16 § 4). If the first action failed on grounds *unrelated to the merits of the controversy*, the plaintiff was permitted to sue out a new writ— known as "journey's account". The purpose of the "journey's account" was to allow a reasonable time for a "journey" to reach the court to sue out a new writ. *Speake, supra* note 21 at 650.

23. The modern notions of *merits* traveled along two developmental tracks that were not necessarily connected. Although entirely consistent, these tracks do not appear to have run parallel one to the other. The *first* track began when writs that failed *dehors the merits* came to be saved from the effect of res judicata by the English prototype of 12 O.S.1991 § 100, the so-called savings statute. *See* discussion, *supra* note 22. The *second* of these emerged—and was later fine-tuned—when the rigidity of writs (forms of action) was replaced by a structured system of defined theories of actionability, each with a catalogue of liability-defeating and recovery-reducing defenses. *See* Part III of the text, *supra*. In the following procedural settings the Oklahoma savings statute has been held *available* to protect the viability of a litigant's cause of action against the bar of res judicata *because* the earlier suit's failure was found to have been *dehors the merits:* (a) *dismissal for nonjoinder of a party plaintiff* (*Haught v. Continental Oil Co.*, 192 Okl. 345, 136 P.2d 691, 693 (1943)); (b) *on voluntary dismissal without prejudice before trial* (*Powers v. Atchison,*

*"merits"*—for its application to § 952(b)(3)—must not vary one iota from that word's meaning elsewhere in Oklahoma's statutory compilation. Any departure from these strictures would foist upon our law inconsistent and aberrational jurisprudence. *Today's pronouncement is fraught with that flaw.*

## VI

¶14 ALTHOUGH AN ISSUE ON THE MERITS MIGHT BE TENDERED IN A POSTJUDGMENT PROCEEDING, THIS CASE PRESENTS A POSTJUDGMENT ISSUE THAT IS PURELY COLLATERAL TO THE MERITS OF THE ADJUDGED INTERSPOUSAL ALIMONY OBLIGATION

¶15 The question sought to be presented in this case is not one "on the merits of the controversy." Instead, it tenders for this court's review a purely procedural point that arose at the postjudgment enforcement stage of the obligation.[24] Practice and procedure govern and define the methods by which the

substantive law is effected and enforced.[25] Enforcement norms are *remedial* in nature. *They have no bearing on the merits of a controversy.*[26] The relief sought here clearly falls into the realm of adjective law. It lies beyond this court's § 952(b)(3) cognizance to review certified issues on the merits of a controversy.

## SUMMARY

¶16 The provisions of § 952(b)(3)[27] plainly require that an interlocutory order certified for this court's review affect *a substantial part of the merits of the controversy. The court's power to review certified orders clearly stands confined to those dispositions which deal with issues on the merits of a controversy.*[28] Inasmuch as the certified *postjudgment* issue before us today is *dehors the merits of the interspousal alimony obligation to be enforced,* it does not present a matter within this court's § 952(b)(3) cognizance. Evenhanded fairness calls for undeviating enforcement of conformity to orderly process.[29] Judicial institutions are without power to grant dispensation from jurisdictional prerequisites that are statutorily imposed.[30]

Topeka & S.F. Ry. Co., Okl., 392 P.2d 744, 745 (1964)); (c) *on dismissal for mislaid venue (C & C Tile Co., Inc. v. Independent School Dist. No. 7 of Tulsa County, Okl.,* 503 P.2d 554, 559 (1972)); (d) *on dismissal for lack of jurisdiction (Edmison v. Crutsinger,* 165 Okl. 252, 25 P.2d 1103, 1108–1110 (1933)) (a timely-filed federal lawsuit was dismissed for lack of jurisdiction); *Williams v. Okl. Nat. Stockyards Co., Okl.,* 577 P.2d 906, 908 (1978) (a timely-invoked compensation claim dismissed earlier was rested on jurisdictional grounds); (e) *on dismissal without prejudice for failure to pay costs (Myers v. First Presby. Church of Perry,* 11 Okl. 544, 69 P. 874, 876 (1902)).

24. In *Passman, supra* note 7, the Court distinguished between the concepts of "cause of action" and "relief" awarded:
"[C]ause of action is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court; and relief is a question of the various remedies a federal court may make available." *Id.,* 442 U.S. at 240, n. 18, 99 S.Ct. at 2274, n. 18 (emphasis mine).
Civil contempt is a *remedial measure* for the enforcement of a judgment. *Harber v. Shaffer,* 1988 OK 45, 755 P.2d 640, 641; *Kelley v. Kelley,* 206 Okl. 188, 242 P.2d 439, 441 (1952).

25. In *Haugens v. Holmes,* 314 Ill.App. 166, 41 N.E.2d 109, 111 (1942), the court explained that

the purpose of the statute relating to the enforcement of judgments "is *remedial* and affords a means of collecting a judgment by forcing the sale of the judgment debtor's property, real or personal, or both, to the extent necessary to satisfy the debt and costs." *First Nat'l Bank of Mt. Zion v. Fryman,* 236 Ill.App.3d 754, 176 Ill.Dec. 930, 934, 602 N.E.2d 876, 880 (1992). Procedure has been defined as the mode or proceeding by which a legal right is enforced, as distinguished from the law which gives or defines the right. *Jones v. Garrett,* 192 Kan. 109, 386 P.2d 194, 198–99 (1963); *Saylors v. Riggsbee,* 544 S.W.2d 609, 610 (Tenn.1976).

26. *Jones, supra* note 25 at 198–99; *Saylors, supra* note 25 at 610. See also *Passman, supra* note 7, 442 U.S. at 240, 99 S.Ct. at 2274.

27. For the pertinent terms of 12 O.S. 1991 § 952(b)(3), see *supra* note 1.

28. *Beasler supra* note 5 at 814; *Young, supra* note 5 at 23; *White supra* note 5 at 16; *Roark, supra* note 5 at 390 (Opala, J., concurring).

29. Fundamental fairness cannot be afforded except within a framework of orderly procedure. *Pryse, supra* note 10 at 438.

¶17 I would hence deny this petition for certiorari. It tenders nothing that addresses "the merits" of this already-adjudicated alimony obligation. *The issue certified for decision affects solely the obligation's post-decree enforcement.*

**30.** *O'Bannon v. Oklahoma Tax Commission,* 1981 OK 99, 633 P.2d 741, 742.